BERNARD MANCUSO, JR., AND WIFE, FRANCES W. MANCUSO,
CHRISTOPHER L. BURRIS, AND WIFE, LINDA BURRIS AND
MANCUSO DEVELOPMENT, INC., PLAINTIFFS
v.
BURTON FARM DEVELOPMENT COMPANY LLC AND BODDIE-NOELL
ENTERPRISES, INC., DEFENDANTS

No. COA13-38

Filed 17 September 2013

1. **Contracts—breach of implied contract—express contract precludes implied contract**

   The trial court did not err by granting summary judgment in favor of defendants with respect to plaintiffs' claim for breach of an implied contract. The parties executed an express contract that explicitly absolved defendants from any obligation to build a marina and an express contract precludes an implied contract with reference to the same matter.

2. **Fraud—failure to construct marina—no guarantee—failure to show obligation**

   The trial court did not err by granting summary judgment in favor of defendants with respect to plaintiffs' fraud claims based on defendants' failure to construct a marina. The relevant documents stated that there was no guarantee that any marina would ever be built, and plaintiffs failed to cite any legal support for their assertion that defendants had an obligation to provide express notice of any changes in their development plans.

3. **Unfair Trade Practices—failure to construct marina— expressly disavowed any reliance on oral statements or marketing materials**

   The trial court did not err by granting summary judgment in favor of defendants with respect to plaintiffs' unfair or deceptive trade practices claim based on defendants' failure to construct a marina. Plaintiffs expressly disavowed any reliance upon oral

statements or non-contractual marketing materials when they purchased property in Arlington Place.

**4.  Corporations—piercing corporate veil—dependent on viability of underlying claims**

The trial court did not err by granting summary judgment in favor of defendants with respect to plaintiffs' attempt to assert a claim against Boddie-Noell by piercing Burton Farm's corporate veil. Plaintiffs' claim was dependent on the viability of their underlying claims against Burton Farm, and the Court of Appeals affirmed summary judgment in defendants' favor on those claims. Thus, plaintiffs' appeal from the order denying plaintiffs' motion to compel discovery was dismissed as moot.

Appeal by plaintiffs from orders entered 22 May 2012 by Judge Benjamin T. Alford and 7 September 2012 by Judge Paul L. Jones in Pamlico County Superior Court. Heard in the Court of Appeals 4 June 2013.

*Wyrick Robbins Yates & Ponton LLP, by K. Edward Greene and Tobias S. Hampson, for Plaintiff-appellants.*

*Poyner Spruill LLP, by J. Nicholas Ellis, for Defendant-appellees.*

ERVIN, Judge.

Plaintiffs Bernard and Frances Mancuso, Christopher and Linda Burris, and Mancuso Development, Inc., appeal from an order granting summary judgment in favor of Defendants Burton Farm Development Company, LLC, and Boddie-Noell Enterprises, Inc., and from an order denying their motion to compel discovery. On appeal, Plaintiffs argue that (1) Judge Jones erred by granting summary judgment in favor of Defendants with respect to their claims for breach of implied contract, fraud, and unfair or deceptive trade practices and with respect to their request to pierce Burton Farm's corporate veil so as to reach Boddie-Noell and that (2) Judge Alford erred by denying their motion to compel the production of certain documents during the course of the discovery process. After careful consideration of Plaintiffs' challenges to the trial courts' orders in light of the record and the applicable law, we conclude that Judge Jones' summary judgment order should be affirmed and that Plaintiff's appeal from Judge Alford's discovery order should be dismissed as moot.

## I. Factual Background

### A. Substantive Facts

This appeal arises from the development of approximately 900 acres of real property located in Pamlico County known as Arlington Place and revolves around a dispute over the extent to which Defendants failed to comply with an alleged obligation to construct a deep water marina in the course of developing the property. Boddie-Noell is the majority owner of Burton Farm, with both entities having been involved in the development of Arlington Place. Plaintiff Mancuso Development, Inc., is a real estate development and construction company. Plaintiffs Bernard Mancuso, Jr., and his wife, Frances Mancuso, were Mancuso Development's officers and sole shareholders. In addition, Plaintiffs Christopher Burris and Linda Burris served as Mancuso Development's Construction Supervisor and Office Manager, respectively.

Defendants purchased the land for Arlington Place in October 2005. According to the marketing materials distributed to potential buyers and the statements made by Defendants' employees, Defendants' plans for the development of Arlington Place included the construction of various recreational facilities, including a clubhouse, a swimming pool, a tennis court, and a marina. Plaintiffs became involved with Arlington Place in 2006, at which time Mr. Mancuso spoke with a Boddie-Noell representative about the extent to which Mancuso Development should participate in Arlington Place's "Signature Builder" program. After discussing the matter among themselves, Plaintiffs decided to buy a certain number of lots in Arlington Place and to participate in the Signature Builders program.

In early October 2006, Arlington Place held a "Phase 1 launch" and began selling lots in the development. Plaintiffs attended the launch, at which time they were provided with various marketing materials, had an opportunity to view the proposed development on land and by means of a helicopter ride, and had the chance to speak with Defendants' representatives. At that point, Defendants' intention to construct a marina was indicated in the marketing materials which they disseminated in a variety of ways. On 3 October 2006, Plaintiffs executed contracts for the purchase of five lots, three of which were deeded to both the Burrises and the Mancusos, one of which was deeded to the Mancusos, and one of which was deeded to the Burrises. At that time, Plaintiffs were provided with a HUD property report in a CD format.

On 5 October 2006, a plat for Phase 1 of Arlington Place was filed in the office of the Pamlico County Register of Deeds. The plat for Phase 1 did

not reflect the construction of a marina. A declaration of restrictive covenants, which was recorded on 31 October 2006, states that Defendants were developing Arlington Place "pursuant to a master plan on file with the Town of Minnesott Beach" and that the "Master Plan [was] subject to continuous revision and change by Declarant, in its discretion."

Although construction had not yet begun, Defendants continued to indicate during 2005 and 2006 that a marina was planned as part of Arlington Place. In May 2008, Mancuso Development contracted with Defendants to serve as the project manager for Arlington Place. Acting in this capacity, Mr. Mancuso attended staff meetings at which Defendants continued to suggest that they would eventually build a marina in Arlington Place. In February 2010, a model home that Plaintiffs built on Lot 139 in Arlington Place was sold to the owner of Lot 117. As part of that transaction, Plaintiffs agreed to accept Lot 117 in trade and to give the buyers a $100,000.00 credit towards the purchase price of the model home. In March 2010, Plaintiffs entered into an agreement with Burton Farm and Douglas Anderson, an executive with Boddie-Noell, in which Mancuso Development agreed to build a house on another lot in Arlington Place.

In December 2010, Mancuso Development's contract as project manager for Arlington Place was canceled, subject to a thirty day notice period. In January 2011, Mr. Mancuso attended a management meeting at which he was told that Defendants had no binding legal obligation to build a marina and that constructing a marina made "no sense" given the current economic situation.

### B.  Procedural History

On 29 April 2011, Plaintiffs filed a complaint against Defendants in which they asserted claims sounding in breach of implied contract, fraud, unfair or deceptive trade practices, and piercing Burton Farm's corporate veil and sought both compensatory and punitive damages. On 23 May 2011, Defendants filed a motion seeking the dismissal of Plaintiffs' complaint pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6), and a motion seeking the imposition of sanctions pursuant to N.C. Gen. Stat. § 1A-1, Rule 11. Defendants' motions were denied on 13 June 2011 by means of an order entered by Judge John E. Nobles, Jr.

On 20 July 2011, Defendants filed an answer in which they denied the material allegations of Plaintiff's complaint and in which Burton Farm asserted a counterclaim against Mancuso Development. Mancuso Development filed a reply to Burton Farm's counterclaim on 14 September 2011. On 14 February 2012, Plaintiffs filed a motion

seeking the entry of an order compelling Defendants to respond to certain requests for the provision of financial and corporate information relating to Boddie-Noell. Plaintiffs' motion to compel was denied by Judge Alford on 22 May 2012.

On 30 July 2012, Defendants filed a motion seeking the entry of summary judgment in their favor. On 7 September 2012, Judge Jones entered an order granting summary judgment in favor of Defendants. Plaintiffs noted an appeal to this Court from the trial court's summary judgment order and from the denial of their motion to compel. On 15 October 2012, Burton Farm voluntarily dismissed its counterclaim against Mancuso Development without prejudice.

## II.  Legal Analysis

### A.  Validity of Summary Judgment Order

#### 1.  Standard of Review

Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2012). " 'When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party.' " *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (quoting *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)). "A genuine issue of material fact arises when the 'facts alleged . . . are of such nature as to affect the result of the action.' " *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182, 711 S.E.2d 114, 116 (2011) (quoting *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971)) (omission in original); *see also City of Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 654, 268 S.E.2d 190, 193 (1980) (stating that an "issue is material if, as alleged, facts 'would constitute a legal defense, or would affect the result of the action or if its resolution would prevent the party against whom it is resolved from prevailing in the action' ") (quoting *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518, 186 S.E.2d 897, 901 (1972)).

The moving party has the burden of "show[ing] the lack of a triable issue of fact and to show that he is entitled to judgment as a matter of law." *Moore v. Crumpton*, 306 N.C. 618, 624, 295 S.E.2d 436, 441 (1982) (citing *Oestreicher v. Am. Nat'l Stores*, 290 N.C. 118, 131, 225 S.E.2d 797, 806 (1976)). "A party moving for summary judgment may

prevail if it meets the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982).

"Our standard of review of a trial court's order granting or denying summary judgment is *de novo*." *Bryson v. Coastal Plain League, LLC*, __ N.C. App __, __, 729 S.E.2d 107, 109 (2012) (citing *Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009)). " 'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *Craig*, 363 N.C. at 337, 678 S.E.2d at 354 (quoting *In re Appeal of The Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

### 2. Viability of Plaintiffs' Claims

### a. Breach of Implied Contract

[1] As an initial matter, Plaintiffs argue that the trial court erred by granting summary judgment in favor of Defendants with respect to their claim for breach of an implied contract. According to Plaintiffs, Defendants had a legal and contractual obligation to construct a marina given that "the written contractual documents" "incorporate the Restrictive Covenants which reference the Master Plan showing a marina on file with the Town." In addition, Plaintiff's assert that, despite the fact that the parties had entered into an express contract, they are entitled to pursue a claim for breach of an implied contract on the grounds that applicable "case law establishes [that] parol evidence and verbal statements may be used to establish a developer's implied promise to provide an amenity in a subdivision." We do not find Plaintiffs' arguments persuasive.

A claim for breach of an implied contract "is generally cognizable under North Carolina law," *In re Proposed Foreclosure of Claim of Lien Filed Against Johnson*, 366 N.C. 252, 259, 741 S.E.2d 308, 312 (2012), and "rests on the equitable principle that one should not be allowed to enrich himself unjustly at the expense of another." *James River Equip., Inc. v. Tharpe's Excavating, Inc.*, 179 N.C. App. 336, 346, 634 S.E.2d 548, 556 (citation and quotation marks omitted), *disc. review denied*, 361 N.C. 167, 639 S.E.2d 651 (2006) (citations omitted). However, "[it] is a well established principle that an express contract precludes an implied contract with reference to the same matter," *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962)

MANCUSO v. BURTON FARM DEV. CO. LLC

[229 N.C. App. 531 (2013)]

(citing *Ranlo Supply Co. v. Clark*, 247 N.C. 762, 765, 102 S.E.2d 257, 259 (1958)) (other citations omitted), so that, if "there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988) (citing *Vetco Concrete Co.*, 256 N.C. at 713-14, 124 S.E.2d at 908). In addition, since "[t]here cannot be an express and an implied contract for the same thing existing at the same time," "[n]o agreement can be implied where there is an express one existing." *Vetco*, 256 N.C. at 713-14, 124 S.E.2d at 908. We also note the "familiar principle that the interpretation of a contract which is free from ambiguity involves a matter of law for the decision of the court and not a matter of fact for the determination of the jury." *Drake v. City of Asheville*, 194 N.C. 6, 9, 138 S.E. 343, 344 (1927).

In the present case, the parties executed an express contract that addressed Defendants' obligations relating to the provision of recreational facilities such as a marina, a fact which precludes any consideration of evidence which contradicts the terms of that express agreement and tends to show the existence of an "implied contract." A careful analysis of the documents that embody the express contract between the parties, which include the Purchase Agreements and the United States Department of Housing and Urban Development property report, which was expressly incorporated into each Purchase Agreement,[1] establishes that Defendants were entitled to summary judgment in their favor.

The Purchase Agreements between the parties specifically provide that:

> BY THE EXECUTION HEREOF YOU ACKNOWLEDGE THAT EXCEPT AS SET FORTH HEREIN OR IN THE PROPERTY REPORT GIVEN TO YOU, NO REPRESENTATION, WARRANTY, GUARANTEE OR

---

1. In their brief, Plaintiffs note that, even though 15 U.S.C. § 1703(a)(1)(B) refers to a "printed property report," the HUD report was provided to them in CD rather than hard copy format. Assuming, without in any way deciding, that Defendants' decision to provide the HUD report in CD rather than hard copy format was improper, Plaintiffs have neither alleged nor shown any prejudice resulted from the format in which the HUD report was provided to Plaintiffs. In addition, even though Plaintiffs may have signed the Purchase Agreements before reading the HUD report, the Purchase Agreements provide a seven day cancellation period. Plaintiffs have not claimed that any of them lacked access to a computer or printer, had difficulty printing a copy, made an unsuccessful effort to obtain a hard copy of the HUD report from Plaintiffs, or were otherwise prejudiced by the form in which the HUD report was provided to them. As a result, we conclude that the fact that Plaintiffs received the HUD in CD rather than hard copy format does not entitle Plaintiffs to relief.

PROMISE, EXPRESS OR IMPLIED, HAS BEEN MADE TO OR RELIED UPON BY YOU IN MAKING THE DECISION TO EXECUTE THIS AGREEMENT AND PURCHASE THE HOMESITE, AND THAT YOU HAVE RELIED UPON YOUR OWN JUDGMENT IN MAKING SUCH DECISIONS AND NOT UPON ANY STATEMENT OR STATEMENTS MADE BY SELLER, ITS AGENTS, EMPLOYEES OR REPRESENTATIVES, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT OR IN THE PROPERTY REPORT.

In addition, the Purchase Agreements include a merger clause which provides that the "Agreement represents the entire agreement between the parties and may not be modified or amended except as agreed between the parties in writing." Thus, the Purchase Agreements specifically disclaim the right of any purchaser to rely on any representation not contained in the relevant contractual documents and provide that the entire agreement is contained in the Purchase Agreement and the HUD report.

The HUD report contains numerous warnings concerning the risks inherent in a decision to purchase an unimproved lot in Arlington Place and states in the clearest possible terms that Defendants had not obligated themselves to complete various proposed improvements, such as the marina. For example, the first page of the HUD report states, in large bold-faced capital letters, **"READ THIS PROPERTY REPORT BEFORE SIGNING ANYTHING."** The opening section of the HUD report, which is titled "Risks of Buying Land," begins by stating that:

RISKS OF BUYING LAND

The future value of any land is uncertain and dependent upon many factors. DO NOT expect all land to increase in value.

Any value that your homesite may have will be affected if the roads, utilities and all proposed improvements are not completed.

After the section addressing the "Risks of Buying Land," another warning appears which states that:

THROUGHOUT THIS PROPERTY REPORT THERE ARE SPECIFIC WARNINGS CONCERNING THE DEVELOPER, THE SUBDIVISION OR INDIVIDUAL HOMESITES. BE

SURE TO READ ALL WARNINGS CAREFULLY BEFORE
SIGNING ANY CONTRACT OR AGREEMENT.

The next portion of the HUD Report addresses matters of "General
Information," including an explicit warning that the "Developer may
change its plans for this Subdivision from time to time in its sole dis-
cretion." After this general introductory information, the HUD Report
contains sections addressing specific issues, such as water and sewer
availability, easements, the filing of plats, and proposed private roads.
Each of these report sections contain separate warnings printed in all
capital letters advising prospective purchasers (1) that there was no
guarantee or promise by Defendants that they would not default on
the deed of trust applicable to the entire development before obtain-
ing a release from that overall deed of trust relating to the purchaser's
homesite, in which case the purchaser would lose his or her lot; (2) that
regulatory authorities had not approved the proposed plats and might
"require significant alterations before they will approve them" or refrain
from "allow[ing] the land to be used for the purpose for which it is being
sold;" (3) that no funds had been set aside to guarantee completion of
subdivision roads; and (4) that the use of an on-site septic system had
not been approved for individual homesites and that "there are no assur-
ances that permits can be obtained for the installation and use of an
individual on-site system." As a result, the HUD report warned prospec-
tive purchasers that, because Arlington Place was in the early stages of
development, Defendants did not guarantee the successful completion
of even the most basic aspects of the project, such as obtaining authori-
zation to build residences on particular homesites, obtaining permission
to construct an on-site septic system, or completing subdivision roads.

    The "Recreational Facilities" section, which addresses the extent of
Defendants' obligations regarding the provision of amenities, such as a
marina, contains additional disclaimers. At the beginning of this section,
the HUD report states that "[w]e currently plan to construct the facilities
listed in the chart below; however our plans have not been finalized and
are subject to change." Significantly, the "chart below" included only two
items: parks and walking trails. In other words, the marina upon which
Plaintiffs' claims rest is not even listed among the recreational facili-
ties that were "currently plan[ned]." In addition, the following statement
appears immediately after the "chart below:"

        We are not contractually obligated to provide or
        complete the above-referenced amenities and there is
        therefore no assurance that they will ever be provided or

completed. Our plans are subject to change from time to
time in our sole discretion.

At the conclusion of the "Recreational Facilities" section is a subsection
entitled "Other Facilities" that discusses the possible creation of private
clubs, including a yacht club that would be appurtenant to a proposed
marina, and that provides, in pertinent part, that:

> A private membership club is being established to
> own and operate a swimming pool, clubhouse and tennis
> courts[.] . . . Plans for these facilities and dues have not
> been established at this time; however, the Developer is
> building these amenities in conjunction with the develop-
> ment of the Phase 1 lots. . . .

> A second club is being contemplated by the Developer
> that is contingent upon the [developer's] ability to con-
> struct a marina at the Subdivision. The Developer is pur-
> suing plans and permits for a marina facility at this time;
> however, the plans are in the formative stages only and
> there is no assurance that the marina will ever come to
> fruition. If developed, the developer intends to create
> another club to be the Arlington Place Yacht Club that will
> include amenities to be determined by the Developer[.] . . .
> The Yacht Club is proposed only and may never be built
> or operated.

> We are not contractually obligated to provide or com-
> plete the Swim and Tennis Club or the Arlington Place
> Yacht Club and there is therefore no assurance that they
> will ever be provided or completed.

Although Plaintiffs contend that this "language is consistent with
Plaintiffs' understanding, based on Defendants' representations, [that]
construction of the marina was contingent on obtaining a permit
and would begin once the permit was obtained," we do not find this
logic persuasive.

As an initial matter, given the explicit merger clause contained in the
Purchase Agreement, Plaintiffs may not properly rely on "Defendants'
representations" except as contained in the written documents.
Moreover, Plaintiffs' "understanding" is inconsistent, rather than con-
sistent, with the language quoted above, which states explicitly that
the developers' "plans [for the construction of a marina and associated
yacht club] are in the formative stages only and there is no assurance

that the marina will ever come to fruition." We find it difficult to imagine language that would more clearly inform prospective buyers that Defendants were not contractually obligated to build any recreational facilities, including the marina. The inclusion of the phrase "contingent upon the [developer's] ability" in the relevant report language does not, despite Plaintiffs' assertion to the contrary, suffice to create any material issue of fact given that "ability" is a generalized term that allows for the consideration of a wide variety of factors, including economic feasibility, the ability to obtain any necessary permits, and other potential difficulties. As a result, we have no hesitation in concluding that the language contained in the "Recreational Facilities" section of the HUD report is clear, that none of its terms are ambiguous, and that it unequivocally establishes that Defendants had not assumed any contractual duty to actually construct a marina in Arlington Place.

To summarize the result of our analysis of the relevant contractual documents, the Purchase Agreements incorporate the HUD report and expressly bar the signatories from asserting that their decision to enter into the underlying contract rested, even in part, on information not contained in the relevant contractual documents, including oral statements, marketing brochures, or other written materials outside the contents of the Purchase Agreement and the HUD report. For that reason, we further conclude that, by executing the Purchase Agreements, Plaintiffs explicitly acknowledged that their decision to purchase lots in Arlington Place rested solely on the representations made by and conditions set out in the Purchase Agreement and the HUD report. In addition, we conclude that the unambiguous provisions of the HUD report establish that Defendants were not under any legal obligation to construct a marina and that, given the language of the Purchase Agreements, no such obligation could be inferred from marketing materials, oral representations, or similar sources of information. As a result, given that the record establishes the existence of an express contract between the parties and the fact that this express contract explicitly absolves Defendants from any obligation to build a marina in the event that they elected not to do so, the trial court did not err by granting summary judgment in favor of Defendants with respect to Plaintiffs' implied contract claim.

In seeking to persuade us to reach a different result, Plaintiffs argue that the existence of an implied contract requiring the construction of a marina is shown by provisions in the recorded plats and covenants. On 5 October 2006, a plat for Arlington Place Phase 1 was filed in the office of the Pamlico County Register of Deeds. However, the 5 October 2006 plat does not depict the construction of a marina, given that this facility

was proposed for a later part of the development process designated as "Phase 3." The restrictive covenants incorporated into the parties' deeds did state that Defendants were developing Arlington Place "pursuant to a master plan on file with the Town of Minnesott Beach," which was "subject to continuous revision and change by Declarant, in its discretion." As Plaintiffs correctly note, the Master Plan references the proposed marina, describing it as "currently planned." However, given that the applicable restrictive covenants explicitly state that the Master Plan was "subject to continuous revision and change by Declarant, in its discretion," the fact that a discussion of the proposed marina was contained in that document did not create any sort of legally enforceable obligation on Defendants' part to build the marina. As a result, the fact that "the written contractual documents . . . incorporate the Restrictive Covenants which reference the Master Plan showing a marina on file with the Town" does not support a decision to overturn Judge Jones' order.

In addition, Plaintiffs argue that "case law establishes [that] parol evidence and verbal statements may be used to establish a developer's implied promise to provide an amenity in a subdivision." According to well-established North Carolina law, however, "[t]he parol evidence rule is a rule of substantive law, though it is often expressed as if it were a rule of evidence." *Phelps v. Spivey*, 126 N.C. App. 693, 697, 486 S.E.2d 226, 229 (1997).

> Generally, the parol evidence rule prohibits the admission of evidence to contradict or add to the terms of a clear and unambiguous contract. Thus, it is assumed the [parties] signed the instrument they intended to sign[,] . . . [and, absent] evidence or proof of mental incapacity, mutual mistake of the parties, undue influence, or fraud[,] . . . the court [does] not err in refusing to allow parol evidence[.]

*Drake v. Hance*, 195 N.C. App. 588, 673 S.E.2d 411, (2009) (quoting *Thompson v. First Citizens Bank & Tr. Co.*, 151 N.C. App. 704, 708-09, 567 S.E.2d 184, 188 (2002) (internal citations and quotations omitted), *Hall v. Hotel L'Europe, Inc.*, 69 N.C. App. 664, 666, 318 S.E.2d 99, 101 (1984), and *Vestal v. Vestal*, 49 N.C. App. 263, 266-67, 271 S.E.2d 306, 309 (1980)). "[M]erger clauses were designed to effectuate the policies of the Parol Evidence Rule; i.e., barring the admission of prior and contemporaneous negotiations on terms inconsistent with the terms of the writing" and "create a rebuttable presumption that the writing represents the final agreement between the parties." *Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987), *disc. review denied*, 321 N.C. 747, 366 S.E.2d 871 (1988). As we have already established, the Purchase

Agreements and the HUD report are devoid of any unclear or ambiguous terms that need clarification based upon the consideration of parol evidence. Moreover, instead of clarifying the meaning of ambiguities in the documents embodying the parties' contract, the evidence concerning oral statements by Defendants' agents and the language contained in various marketing materials upon which Plaintiffs rely flatly contradict the parties' express contract. To the extent that Plaintiffs are attempting to utilize this evidence to establish the existence of a separate implied contract rather than to explain the proper interpretation of an express contract, that effort runs afoul of the legal principle that an implied contract will not be recognized in an instance covered by an express contract. As a result, Judge Jones correctly rejected Plaintiffs' attempt to establish the existence of an obligation on the part of Defendants to construct the marina based upon parol evidence.

Although Plaintiffs have cited a number of decisions in support of their effort to persuade us to give legal effect to the statements and other materials upon which they rely, we do not believe that these decisions support the decision that Plaintiffs wish us to make. For example, Plaintiffs describe *Lyerly v. Malpass*, 82 N.C. App. 224, 346 S.E.2d 254 (1986), *disc. review denied*, 318 N.C. 695, 351 S.E.2d 748 (1987), as the "seminal case addressing implied promises to construct amenities in a development[.]" The *Lyerly* plaintiffs had purchased lots in the Inlet Point subdivision from the defendants, who had developed that subdivision. According to the plaintiffs, the defendants had pledged to build a boat basin, to provide an aquatic connection to the Intracoastal Waterway, and to pave an access road. More specifically,

> [a]ccording to the subdivision plats filed with New Hanover County, this subdivision was to include a boat basin with a channel for access to the Intracoastal Waterway. The channel was to be approximately 250 feet long, thirty feet wide and a minimum of six feet deep at mean low tide. . . . Also shown on the recorded plat was Inlet Point Drive, a private road providing the subdivision with access to U.S. Highway 421. The plat stated that the street was "to be built to North Carolina Department of Transportation specifications."

*Lyerly*, 82 N.C. App at 226, 346 S.E.2d at 256. As a result, in *Lyerly*, unlike in the present situation, the recorded plats and restrictive covenants included a commitment to construct the disputed amenities. In addition, nothing in our opinion in *Lyerly* indicates that the relevant contractual documents contained an explicit disclaimer of specific obligations or language precluding reliance on external representations, both of which

are present here. As a result, given the absence of any indication that the contractual documents precluded consideration of oral statements and other non-contractual representations, *Lyerly* does not justify a decision in Plaintiffs' favor.

We reach a similar conclusion after analyzing the other decisions upon which Plaintiffs rely. For example, Plaintiffs cite *River Birch Assoc. v. City of Raleigh*, 326 N.C. 100, 388 S.E.2d 538 (1990), for the proposition that "[p]arol assurances made by a developer to prospective buyers regarding the general scheme or plans of development that the developer intends to pursue are admissible to establish the existence of such a scheme" and that such "parol evidence may be in the form of a field map, sales brochures, maps, advertising or oral statements on which purchasers relied." 326 N.C. at 127, 388 S.E.2d at 553 (citing *Warren v. Detlefsen*, 281 Ark. 196, 199, 663 S.W.2d 710, 711-12 (1984)). However, a careful review of *River Birch* reveals that it affirms, rather than rejects or undermines, the rule that such evidence may not be admitted for the purpose of contradicting the applicable contractual documents. The primary issue in *River Birch* was the extent to which the City of Raleigh had the authority under a municipal ordinance to require a developer to convey land depicted as a common area on preliminary plats to the homeowners' association. In considering the manner in which a subsidiary issue relating to the proper location of the common area should be resolved, the Supreme Court stated that:

> We do not suggest the affidavits are competent to identify the boundaries of the common area, for then the declarations would be used to alter the terms of the written agreement. However, where the declarations confirm that the parties intended certain documents to identify the boundaries of land referred to in other documents, then those declarations will be admitted for that limited purpose. . . . Where a contract to convey land that otherwise satisfies the statute of frauds is part oral and part written, parol evidence is admissible so long as it does not conflict with the writing.

*Id.* at 127, 388 S.E.2d at 554 (citing *Boone v. Boone*, 217 N.C. 722, 729, 9 S.E.2d 383, 387 (1940)). As a result, a careful review of *River Birch* reveals that it affirms, rather than rejects or undermines, the rule that parol evidence may not be admitted for the purpose of contradicting binding contractual documents. The same is true of *Wall v. Fry*, 162 N.C. App. 73, 590 S.E.2d 283 (2004), another case cited by Plaintiffs, which undercuts the general rule discussed above. As a result, Plaintiffs have

not cited any authority, and we know of none, which stands for the proposition that parol evidence may be considered for the purpose of contradicting the terms of a written contract or establishing the existence of an implied contract in a situation which would otherwise be governed by an express agreement.

As further support for their position, Plaintiffs direct our attention to the term "other property" as found in the restrictive covenants. "Other property" is defined in the restrictive covenants as:

> any real property, other than a Homesite, Townhome Lot, Residential Condominium Unit, Unimproved Tract or Common Elements, that is located within the Community and has been subjected to this Master Declaration pursuant to an amendment hereto or supplemental declaration referring to the Master Declaration, made in accordance with the provisions hereof and recorded in the land records for Pamlico County, North Carolina. Other Property may include, but shall not be limited to: boat slips, dry storage units and/or other marina facilities, private club facilities, commercial tracts, buildings and/or units; and assisted living facilities.

As a result of the fact that the covenants afford Defendants the right to "convey or lease other property, or an interest therein, to the Association for use as Common Elements," in which event the homeowners' association was required to "accept all such conveyances and immediately become responsible for the operation and maintenance of all such properties," Plaintiffs contend that there is "a genuine issue of material fact as to whether the covenants at issue implied the construction of a marina[.]" We conclude, however, that the covenant language upon which Plaintiffs' argument rests does not suggest that Defendants had a contractual obligation to build a marina. Instead, the language in question simply provides that, if Defendants chose to construct the facility in question, it would be classified as "other property" subject to subsequent conveyance to the homeowner's association. As a result, the covenant language upon which Plaintiffs rely does not suffice to create a genuine issue of material fact concerning the extent to which Defendants were obligated to build a marina.

For all of the reasons set forth above, we conclude that (1) the disclaimers in the HUD report, when taken in conjunction with the provisions of the Purchase Agreement, including the merger and integration clauses, establish that Defendants did not assume any legal obligation

to construct a marina; (2) the plat and Master Plan that were recorded with the office of the Pamlico County Register of Deeds do not support Plaintiffs' assertion that Defendants were legally obligated to build the marina; and (3) the parties' decision to execute an express written contract precludes Plaintiffs from prevailing upon an implied contract theory or from attempting to introduce evidence that contradicts the express contract. As a result, the trial court did not err by granting summary judgment in favor of Defendants with respect to Plaintiffs' implied contract claim.

### b. Fraud Claim

[2] Secondly, Plaintiffs claim that they forecast sufficient evidence to support the denial of Defendants' summary judgment motion with respect to their fraud claim, which rests upon two transactions occurring in 2010. In one of these instances, Plaintiffs sold a model home to the owner of another lot in Arlington Place, accepted the buyer's lot in trade, and gave the buyer a $100,000.00 credit towards the purchase of the model home. In the other transaction, Plaintiffs "agreed to build a second model home with an option to purchase the lot." However, according to Plaintiffs, Defendants no longer intended to build a marina immediately upon obtaining a permit to do so at the time at which these transactions occurred. In support of this contention, Plaintiffs cite various emails addressing Defendants' concerns about the economic viability of the Arlington Place development and expressing a recognition that, for some period of time, the development of Arlington Place could not be pursued in an aggressive manner. In other words, Plaintiffs are essentially arguing that Defendants are liable to them in fraud because they failed to keep Plaintiffs apprised about their assessment of the economic landscape and the extent to which their plans relating to the construction of the marina were likely to change. For that reason, Plaintiffs' fraud claim rests upon a presumption that Defendants had a legal duty to keep them apprised of any change in their plans for the development of Arlington Place and that Defendants' failure to "disclose" their change of plan regarding the construction of the marina constituted a breach of that duty.

"While actual fraud 'has no all-embracing definition,' the following essential elements of actual fraud are well established: '(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.' Additionally, any reliance on the allegedly false representations must be reasonable. The reasonableness of a party's reliance is a question for the jury, unless the facts are

so clear that they support only one conclusion." *Forbis v. Neal*, 361 N.C. 519, 526-27, 649 S.E.2d 382, 387, (2007) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974), and citing *Johnson v. Owens*, 263 N.C. 754, 757, 140 S.E.2d 311, 313 (1965), and citing *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 225, 513 S.E.2d 320, 327 (1999)) (citations omitted). As we have already discussed, the relevant documents, including the Purchase Agreements, HUD report, the recorded plat and the restrictive covenants, all uniformly provide that Defendants reserved a right to make changes to their plans for the development of Arlington Place; that Defendants had declined to promise that even the most basic issues, such as the need for a septic system permit, would be favorably addressed in the event that anyone purchased property in Arlington Place; and that there was absolutely no assurance that any marina would ever be constructed. As a result of the fact that the relevant documents clearly state that there was no guarantee that any marina would ever be built at Arlington Place and the fact that Plaintiffs have failed to cite any legal support for their assertion that Defendants had an obligation to provide express notice of any changes in their development plans, Plaintiffs' fraud claim necessarily fails.

The cases upon which Plaintiffs rely in support of their fraud claim do not suggest the appropriateness of reaching a different result. In both of the cases cited by Plaintiffs in support of this aspect of their challenge to Judge Jones' order, the defendant failed to disclose a "fact" rather than a change in his or her own internal thinking. *Sutton v. Driver*, __ N.C. App. __, __, 712 S.E.2d 318, 324-25 (2011) (holding that a representation that a particular tract of property near the property that the plaintiffs were considering purchasing would likely not be sold when the owners of that tract had, in fact, accepted a bid and entered into a sale contract precluded an award of summary judgment); *Brown v. Roth*, 133 N.C. App. 52, 54-55, 514 S.E.2d 294, 296 (1999) (holding that a failure to disclose the heated square footage of a residence precluded an award of summary judgment). In other words, neither of the decisions upon which Plaintiffs place principal reliance hold that, in a situation in which the relevant documents clearly state that a developer's plans are tentative, the defendant has a legally enforceable duty to keep a plaintiff apprised about changes in development plans or to inform a plaintiff about ongoing adjustments in development plans in light of changing economic conditions.[2] Thus, as a result of the fact that Plaintiffs failed

---

2. Although Plaintiffs also argue that Defendants committed a breach of fiduciary duty arising from the fact that a real estate broker failed to disclose Defendants' intentions

to forecast evidence sufficient to establish that Defendants breached a legal duty that they owed to Plaintiffs by failing to "disclose" that, as of 2010, they had decided, consistently with their contractual rights, to postpone construction of the marina, Judge Jones did not err by determining that summary judgment should be entered in Defendants' favor with respect to the fraud claim.

### c. Unfair or Deceptive Trade Practices

[3]  Thirdly, Plaintiffs argue that the trial court erred by granting summary judgment in favor of Defendants with respect to their unfair or deceptive trade practices claim. In support of this contention, Plaintiffs essentially reiterate their contention that Defendants' oral representations and marketing materials demonstrated an intention to build a marina and that Defendants' "actions in marketing Arlington Place on the basis of a marina, which they then claimed no obligation to provide, is an unfair and deceptive practice." We do not find Plaintiffs' argument persuasive.

As we have already indicated, Plaintiffs executed legally binding contracts that (1) explicitly stated that the Purchase Agreement and the HUD report constituted the entire agreement between the parties and contained the only representations upon which a purchaser was entitled to rely in making a lot purchase decision and (2) explicitly indicated that Defendants had provided no assurance that the marina would ever be built. In seeking to persuade us that Judge Jones should have refrained from granting summary judgment in favor of Defendants with respect to this claim, Plaintiffs have failed to address the legal significance of these documents or to articulate any legal basis for a determination that their unfair and deceptive trade practices claim remained viable in light of the existence of these clear and unambiguous contractual provisions. As a result, given that Plaintiffs expressly disavowed any reliance upon oral statements or non-contractual marketing materials when they purchased property in Arlington Place, Judge Jones did not err by granting summary judgment in favor of Defendants with respect to Plaintiffs' unfair and deceptive trade practices claim.

---

concerning the construction of the marina to Plaintiffs at the time of the transactions discussed in the text, the record contains no evidence that the broker upon whose activities Plaintiffs rely had any knowledge of the lot trade involved and the purchase price credit given in connection with the first of these two transactions or that the broker in question had any involvement of any nature in the second of these two transactions. As a result, wholly aside from the fact that Plaintiffs did not plead a breach of fiduciary duty claim of the nature asserted in their brief, we conclude that the evidence forecast by Plaintiffs did not suffice to establish the viability of Plaintiffs' breach of fiduciary duty claim.

### d. Piercing the Corporate Veil

[4] Fourthly, Plaintiffs contend that the trial court erred by granting summary judgment in favor of Defendants with respect to their attempt to assert a claim against Boddie-Noell by piercing Burton Farm's corporate veil. "It is well recognized that courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985) (citation omitted). For that reason, Plaintiffs' veil-piercing claim is, as their counsel candidly admitted during oral argument, dependent on the viability of their underlying claims against Burton Farm. In view of the fact that we have decided to affirm Judge Jones' decision to grant summary judgment in favor of Defendants with respect to Plaintiffs' substantive claims, we need not address Plaintiff's arguments in support of their veil-piercing claim. As a result, Judge Jones did not err by granting summary judgment in Defendants' favor with respect to Plaintiff's veil-piercing claim.

### B. Validity of Discovery Order

[5] Finally, Plaintiffs contend that Judge Alford erred by denying their motion to compel discovery relating to certain Boddie-Noell financial records. As Plaintiffs acknowledge in their brief, we only need to address this contention "if Plaintiffs' claims for piercing and punitive damages survive summary judgment." As a result of our determination that Judge Jones' order granting summary judgment in Defendants' favor should be affirmed, we need not reach the merits of Judge Alford's discovery order and decline to address it.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that Judge Jones did not err by granting summary judgment in Defendants' favor. As a result, Judge Jones' order granting summary judgment in Defendants' favor should be, and hereby is, affirmed and Plaintiffs' appeal from Judge Alford's order denying Plaintiffs' motion to compel discovery should be, and hereby is, dismissed as moot.

AFFIRMED IN PART AND DISMISSED AS MOOT IN PART.

Judges McGEE and STEELMAN concur.