County of Catawba v. Frye Reg'l Med. Ctr., Inc., 2014 NCBC 27.

STATE OF NORTH CAROLINA

CATAWBA COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 2780

COUNTY OF CATAWBA d/b/a
CATAWBA VALLEY MEDICAL
CENTER,

               Plaintiff,

v.

FRYE REGIONAL MEDICAL
CENTER, INC., and TATE SURGERY
CENTER, LLC,

               Defendants.

ORDER AND OPINION

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP by James C. Adams, II, Justin N. Outling, and Forrest W. Campbell, Jr. for Plaintiff.*

*Poyner & Spruill, LLP by S. Todd Hemphill, Matthew A. Fisher, and David R. Broyles and Van Laningham Duncan PLLC by Alan W. Duncan for Defendants.*

Murphy, Judge.

{1}    THIS MATTER is before the Court on Plaintiff County of Catawba d/b/a Catawba Valley Medical Center's ("Catawba") Motion for Partial Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Motion I") and Defendants Frye Regional Medical Center, Inc. ("Frye") and Tate Surgery Center, LLC's ("Tate") (collectively, "Defendants") Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Motion II") in the above-captioned case. Having considered the Motions, the briefs and exhibits filed in support of and in opposition to the Motions, and the arguments of counsel made at a hearing held on February 27, 2014, the Court hereby **DENIES** Motion I and **GRANTS** in part and **DENIES** in part Motion II.

# I.
## PROCEDURAL HISTORY

{2}    Catawba filed its Verified Complaint on September 8, 2011, bringing claims for breach of contract, fraud, and unfair and deceptive trade practices ("UDTP") against Frye, Tate, and Viewmont Surgery Center, LLC ("Viewmont").

{3}    The case was designated a complex business case and assigned to this Court on October 14, 2011.

{4}    On July 26, 2012, Defendants filed their Verified Answer and Counterclaim alleging a cause of action against Catawba for breach of contract and requesting attorney's fees under N.C.G.S. § 75-16.1.

{5}    On October 8, 2013, Catawba dismissed its claims against Viewmont. (Pl.'s Stipulation of Dismissal of Viewmont Surgery Center, LLC, October 8, 2013.)

{6}    Thereafter, on October 21, 2013, Catawba filed Motion I, seeking summary judgment on Catawba's third and fourth claims for relief, as well as on Defendants' counterclaim for breach of contract.  That same day, Defendants filed Motion II, seeking summary judgment on all claims asserted against them in Catawba's Complaint.

{7}    The Court held a hearing on February 27, 2014.

# II.
## FACTUAL BACKGROUND

{8}    The Court recites material and uncontroverted facts from the record for the purpose of deciding the Motions and not to resolve issues of material fact. *See Collier v. Collier*, 204 N.C. App. 160, 161–62, 693 S.E.2d 250, 252 (2010) (citing *Hyde Ins. Agency v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975)).

{9}    Catawba is a political subdivision of the State of North Carolina that owns and operates a licensed acute care hospital in Hickory, North Carolina.  (Compl. ¶ 1.)

{10} Frye is a for-profit corporation that owns and operates a licensed acute care hospital in Hickory, North Carolina. (Compl. ¶ 2.)

{11} Tate is a non-operating, off-campus surgery center that is owned and operated by Frye. (Defs.' Br. Supp. Mot. II 1.)

{12} Viewmont is also an off-campus surgery center that is owned and operated by Frye. (Defs.' Br. Supp. Mot. II 1.)

{13} A certificate of need ("CON") is a written order required by North Carolina law before any entity may construct, develop, or establish a new health service facility in North Carolina. N.C.G.S. § 131E-178(a) (2014). The North Carolina Department of Health and Human Resources ("DHHS") is responsible for issuance of all CONs. N.C.G.S. § 131E-177 (2014).

{14} In May 2004, Frye applied to DHHS for CONs to convert Tate and Viewmont into freestanding ambulatory surgical centers ("ASCs"). (Compl. ¶¶ 8, 10; Defs.' Br. Supp. Mot. II 1.) As Frye's competitor, Catawba filed comments in opposition to Frye's requested CONs, delineating various reasons why Frye's new projects were unnecessary. (Defs.' Br. Supp. Mot. II Exh 1, p. 15). In October 2004, DHHS denied the Tate CON application and approved the Viewmont CON application. (Defs.' Br. Supp. Mot. II 2; Defs.' Br. Supp. Mot. II Exh. 1 ¶ 7; Defs.' Br. Supp. Mot. II. Exh. 2 ¶ 6.)

{15} In November 2004, Catawba filed a contested case against the approval of the Viewmont application ("Viewmont I") and Frye filed a contested case against the denial of the Tate application ("Tate I"). (Defs.' Br. Supp. Mot. II. Exhs. 1–2.)

{16} In January 2005, Catawba applied to DHHS for a CON to acquire a new Computed Tomography ("CT") scanner. (Compl. ¶ 11.) In April 2005, DHHS approved the CT CON application. (Defs.' Br. Supp. Mot. II 3 ¶ 6.) In May 2005, Frye filed a contested case against the approval of the CT application ("CT I"). (Defs.' Br. Supp. Mot. II Exh. 3.)

{17} In June 2005, Catawba, Frye, Viewmont, Tate, and DHHS held a joint mediation of the three contested cases: Viewmont I, Tate I, and CT I. (Compl. ¶ 12.) At the mediation, the parties signed a "Memorandum of Mediation for Global

Settlement of Ambulatory Surgical Facility and CT Scanner Replacement Contested Cases" (the "Global Mediation Memo"). (Compl. Exh. A.) At the mediation, Catawba, Frye, Viewmont, and Tate (without DHHS) also signed a "Memorandum of Mediation of Private Party Settlement Terms for Tate Ambulatory Surgical Facility" (the "Private Mediation Memo") (collectively, the "Mediation Memos"). (Compl. Exh. B.)

{18} The Global Mediation Memo provided an August 12, 2005 deadline for completing the settlement between the parties. (Compl. Exh. A ¶ 3.) If the parties were unable to complete the settlement by the specified date, but had agreed upon a later date to complete it, Frye and Catawba were to dismiss the three pending contested cases without prejudice. (Compl. Exh. A ¶ 3.) However, if the parties were unable to complete the settlement by the later agreed-upon deadline, Frye and Catawba would have the right to refile the contested cases and proceed with litigation. (Compl. Exh. A ¶ 4.) Upon completion of the settlement, Catawba was to withdraw its appeal of the Viewmont approval, and Frye was to withdraw its appeal of the Tate denial and the CT approval. (Compl. Exh. A ¶ 5.) Finally, DHHS agreed to issue the CONs to Viewmont, Catawba, and Tate within five (5) to thirty-five (35) days of dismissal. (Compl. Exh. A ¶¶ 6–8.)

{19} The Global Mediation Memo also contemplated as part of the settlement that "Frye and Catawba will enter into a 50/50 joint venture to develop Tate as an independent ambulatory surgical facility under the current LLC." (Compl. Exh. A ¶ 1.) Similarly, the Private Mediation Memo specified that "Catawba will purchase its 50% interest in Tate" as one of several terms that "would be" part of a "Private Party Settlement Agreement" between Frye and Catawba. (Compl. Exh. B.)

{20} The parties did not complete settlement by the August 12, 2005 deadline and Catawba dismissed Viewmont I, and Frye dismissed Tate I and CT I, all without prejudice. (Defs.' Br. Supp. Mot. II Exhs. 6, 8, 10.) In September 2005, Catawba filed a new contested case challenging the initial approval of the Viewmont application ("Viewmont II"). (Defs.' Br. Supp. Mot. II Exh. 11.) Frye also filed a new contested case challenging the denial of the Tate application ("Tate II")

and a new contested case challenging the approval of the CT application ("CT II"). (Defs.' Br. Supp. Mot. II Exh. 12, 19.)

{21} On November 10, 2005, Catawba and Frye reached a settlement agreement in Viewmont II and CT II (the "Viewmont II/CT II Agreement"). (Defs.' Br. Supp. Mot. II Exh. 13.) This Agreement required Catawba to file a voluntary dismissal with prejudice of Viewmont II and required Frye to file a voluntary dismissal with prejudice of CT II. (Defs.' Br. Supp. Mot. II Exh. 13.) The Viewmont II/CT II Agreement also contemplates that DHHS will issue a CON to Viewmont and Catawba in accordance with each initial application and contains a clause that it "constitutes the entire understanding and agreement among the Parties with respect to the subject matter [t]hereof, and there are no promises, understandings, or representations other than those set forth in the Agreement." (Defs.' Br. Supp. Mot. II Exh. 13.)

{22} On November 16, 2005, Catawba intervened in Tate II to oppose the Tate application. (Defs.' Br. Supp. Mot. II Exh. 20.)

{23} Thereafter, on May 15, 2006, the parties reached two settlement agreements concerning Tate II. Catawba, Frye, Tate, and DHHS entered into a Settlement Agreement (the "Agency Settlement Agreement"). Additionally, Catawba, Frye, and Tate entered into a Private Party Settlement Agreement (the "PPSA") (collectively, the "Tate Agreements"). (Compl. Exh. C, D.)

{24} The stated purpose of the Agency Settlement Agreement is "to settle and compromise the disputes in the pending contested case arising from the application of Frye and Tate for a certificate of need to convert four existing operating rooms . . . to a separately licensed freestanding ambulatory surgical facility . . . ." (Compl. Exh. C.) The Agency Settlement Agreement specifies that the Tate ASC would not be licensed or certified unless Frye and Catawba each shall own a fifty percent (50%) membership interest (Compl. Exh. C ¶ 2), and contains a clause that it "constitutes and contains all of the agreements among all four of the Parties with regard to the settlement of [the] contested case, and there are no terms or

conditions of agreement among all four of the Parties concerning the same, except those which are specifically expressed [t]herein." (Compl. Exh. C ¶ 12.)

{25} Similar to the Agency Settlement Agreement, the PPSA provides that "Frye shall sell to Catawba, and Catawba shall acquire from Frye, a 50% membership interest in Tate, pursuant to the terms of agreements to be formalized hereinafter between Frye and Catawba." (Compl. Exh. D ¶ 2.) Additionally, the PPSA expressly incorporates the Agency Settlement Agreement, including the "material terms and conditions" attached as an exhibit thereto and previously agreed upon by Catawba, Frye, and Tate. (Compl. Exh. D ¶¶ 1–2.) Those "Agreed-Upon Terms" include:

a.      Frye and Catawba were to "prepare appropriate documents reflecting Frye's transfer of assets . . . to Tate, Frye's transfer of a 50% membership interest in Tate to Catawba, Catawba's payment to Frye for the 50% membership interest in Tate, and an amended operating agreement for Tate" (Compl. Exh. C, Exh. B ¶ 1);

b.      The amended operating agreement for Tate was to provide that "Frye and Catawba each shall initially be the only managers of Tate until Neuterra Healthcare ("Neuterra") and the Physicians acquire an interest in Tate" (Compl. Exh C. Exh. B ¶ 2);

c.      The purchase price of $2,650,000.00 was established for Catawba's fifty percent (50%) membership interest in Tate (Compl. Exh. C, Exh. B ¶ 3);

d.      Upon the licensure of Tate as an ASC, Neuterra was to be retained to manage Tate (Compl. Exh. C, Exh. B ¶ 4); and

e.      As part of the terms, both Neuterra and physicians were to be "permitted" to acquire membership interests, but only after Tate became licensed and Catawba and Frye were fifty percent (50%) owners. (Compl. Exh. C, Exh. B ¶ 5.)

{26} The PPSA, together with the Agency Settlement Agreement, "sets forth all of the terms and conditions between [the parties] concerning the settlement and

resolution of [the] contested case, superseding all prior oral and written statements and representations, and . . . there are no terms or conditions between the Private Parties concerning the same except as specifically set forth in these two Agreements." (Compl. Exh. D ¶ 7.)

{27} Pursuant to the Agency Settlement Agreement and the PPSA, Frye dismissed Tate II with prejudice on May 22, 2006. (Defs.' Br. Supp. Mot. II Exh. 24.) On the same day, DHHS issued the CON to Frye for the Tate facility. (Defs.' Br. Supp. Mot. II Exh. 25.) The CON specified that Frye "shall develop the project in a manner consistent with the representations in the project application and with the conditions contained herein" and that Frye shall not have any capital expenditure during the development of the Tate facility that is not included in the project's proposed capital expenditure in the application. (Compl. Exh. E.) Further, the CON required Frye to "make good faith efforts to meet the timetable" established in the CON. (Compl. Exh. E.)

{28} The CON also included a condition that Frye develop Tate in accordance with the representations made in the Supplemental Materials filed with DHHS on March 20, 2006. (Compl. Exh. E.) Included among the representations made in the Supplemental Materials was an estimation of increased physician procedure volumes from Catawba to Tate. (Defs.' Br. Supp. Mot. II Exh. 21 at 153–55.)

{29} Frye's application represented that there would be zero capital costs for the Tate project. (Defs.' Br. Supp. Mot. II Exh. 2 at 40.) However, in October 2007, Frye was advised that renovations to the Tate facility were necessary to bring the facility into compliance with current licensure standards. (Rowell Aff. ¶ 11.) The main necessary renovation was the installation of a new HVAC system that would have an estimated total cost of $639,825.00. (Rowell Aff. ¶¶ 11–12.)

{30} On April 17, 2008, counsel for Catawba wrote a letter to counsel for Frye expressing concern about the development of Tate and the status of its joint ownership by Catawba and Frye:

> I am writing concerning the agreement between [Catawba] and [Frye] to develop Tate Surgery Center as a freestanding ambulatory surgical

facility that is jointly owned by Catawba and Frye. Frye has recently indicated that it is not certain whether it wants to develop Tate. Please be informed that Catawba desires to develop Tate and expects Frye to abide by its contractual obligations to do so. The failure of Frye to proceed with the development would constitute a breach of contract . . . . In fact, Frye is already in breach of the agreements by failing to have the Tate project completed by October 1, 2006.

(Pl.'s Br. Supp. Mot. I Exh. 105.) On May 5, 2008, counsel for Frye responded to the letter:

We . . . disagree that our client is in breach of its agreements with Catawba. Nevertheless, our client agrees that it is time to address the delays both our clients have faced in moving forward with the development of the facility. . . . [W]e dispute your contention that Frye is in breach of the . . . Agreement, due to the fact that the facility was not licensed and certified by October 1, 2006. As you are fully aware, the timetable set forth in the public agreement is the timetable which is included in the CON. It was not a material term between our respective clients, because only the CON Section may determine whether an applicant is meeting its timetable. We agree that it is time to address all of these delays.

(Pl.'s Br. Supp. Mot. I Exh. 135.)

{31} In May 2009, the parties engaged The Coker Group ("Coker") to perform a financial feasibility study of Tate. (Pl.'s Br. Supp. Mot. I Exh. 15.) On December 9, 2009, Coker sent both parties a final draft of its report, which projected Tate to profit in each of its first five (5) years. (Pl.'s Br. Supp. Mot. I Exh. 20 at 8.) In January 2010, Frye requested that Coker conduct additional analysis on Tate's projected growth. (Pl.'s Br. Supp. Mot. I Exh. 7.) On August 18, 2010, Coker's final report again projected that Tate "will be profitable in all projected years." (Pl.'s Br. Supp. Mot. I Exh. 28 at 8.)

{32} On August 26, 2010, representatives of Catawba and Frye met to discuss Tate. (Pl.'s Br. Supp. Mot. I 11.) At the meeting, Catawba's CEO, Tony Rose, tendered a check dated August 24, 2010 in the amount of $2,650,000.00. (Pl.'s Br. Supp. Mot. I 11, Exh. 31.) The check expired sixty (60) days later without being deposited or cashed. (*See* Pl.'s Br. Supp. Mot. I Exh. 31.)

## III.

## LEGAL STANDARD

{33}  "The purpose of summary judgment is to determine whether any issues of material fact exist, and if not, eliminate the necessity of a full trial where only questions of law are involved." *Strickland v. Lawrence*, 176 N.C. App. 656, 661, 627 S.E.2d 301, 305 (2006) (citing *Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 641–42, 281 S.E.2d 36, 40 (1981)).  Thus, the Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c).

## IV.

## ANALYSIS

## A.

## FIRST AND SECOND CLAIMS FOR BREACH OF CONTRACT

{34}  Defendants move for summary judgment on Catawba's first two claims for breach of contract.  Catawba alleges breach of the Global Mediation Memo as well as breach of the Private Mediation Memo.

{35}  Defendants argue that it fully performed its obligations in the Mediation Memos by dismissing Tate I and CT I, and that the Memos' legal force and effect was concluded when Catawba and Frye refiled the new contested cases.  (Defs.' Br. Supp. Mot. II 9–10.)  The Court finds Defendants' argument convincing.  The Global Mediation Memo provides all parties the right to refile contested cases should they fail to complete settlement by a later agreed-upon deadline and provides no subsequent obligations.  (Compl. Exh. A.)  Both Frye and Catawba refiled contested cases, signifying their failure to complete settlement by a later agreed-upon date.  Once the contested cases were refiled, there were no more steps either party could take in carrying out the terms of the Global Mediation Memo.

{36}  Furthermore, the Private Mediation Memo solely outlines what "would be" terms of a private settlement agreement, should one be reached pursuant to the

deadlines in the Global Mediation Memo, evidencing the parties' intention that the Private Mediation Memo serve solely as a memorialization of the parties' settlement discussions. (Compl. Exh. B.) As a mere memorialization of the parties' settlement discussions, the Private Mediation Memo is unenforceable at law. *See Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, 2003 NCBC 3 ¶¶ 34–38 (N.C. Super. Ct. Apr. 28, 2003), www.ncbusinesscourt.net/opinions/2003%20NCBC %203.htm (finding letter of intent unenforceable).

{37}   Therefore, at the moment Frye and Catawba refiled their contested cases, all obligations under the Mediation Memos were fulfilled and their legal force and effect, if any, concluded.

{38}   Furthermore, even assuming the Mediation Memos continued to have legal effect after the contested cases were refiled, the merger clauses contained in the Viewmont II/CT II Settlement Agreement and the Tate II Agreements expressly supersede the Mediation Memos. All three documents include a clause stating that the agreement "constitutes the entire understanding and agreement among the parties with respect to the subject matter hereof" (Defs.' Br. Supp. Mot. II Exh. 13), and "sets forth all of the terms and conditions between them concerning the settlement and resolution of this contested case, superseding all prior oral and written statements and representations . . . ," or similar language. (Compl. Exhs. C–D.)

{39}    Although Catawba correctly contends that a merger clause "create[s] a rebuttable presumption that the writing represents the final agreement between the parties" (Pl.'s Resp. Mot. II 23–24), it has presented no evidence, and the Court finds none in the record, to rebut this presumption.

{41}   The contested cases were the subject of the Mediation Memos and the later Viewmont II/CT II and Tate II Agreements and, as such, the Mediation Memos are superseded by the later Agreements and void.

{42}   Accordingly, the Court **GRANTS** Motion II as to Catawba's first and second claims for breach of contract and **DISMISSES** both claims with prejudice.

B.

THIRD AND FOURTH CLAIMS FOR BREACH OF CONTRACT

{43}   Both Catawba and Frye move for summary judgment on Catawba's third and fourth claims for relief.  Here, Catawba alleges Frye breached both the Agency Settlement Agreement and the PPSA.

1.

PPSA

{44}   "A settlement agreement is a contract governed by the rules of contract interpretation and enforcement."  *Williams v. Habul*, 724 S.E.2d 104, 110 (N.C. Ct. App. 2012).

> To constitute a valid contract, the parties "must assent to the same thing in the same sense, and their minds must meet as to all the terms.  If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement.  . . . The courts generally hold a contract . . . leaving material portions open for future agreement is nugatory and void for indefiniteness.

*Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974) (internal citations omitted).  Accordingly, to be binding, "a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations."  *Id.* (citation omitted).

{45}   Defendants' main argument in relation to its alleged breach of the PPSA is that the PPSA was merely an agreement to agree and, as such, is unenforceable. (Defs.' Br. Supp. Mot. II 10–16.)  This Court has had ample opportunity to consider "agreements to agree" and perhaps the most important consideration in determining whether a document is just an agreement to agree is whether the document contains all material terms.  *See, e.g., Crockett Capital Corp. v. Inland American Winston Hotels, Inc.*, 2009 NCBC 5 (N.C. Super. Ct. Mar. 13, 2009), http://www.ncbusinesscourt.net/opinions/2009_NCBC_5.pdf; *JDH Capital, LLC v. Flowers*, 2009 NCBC 4 (N.C. Super. Ct. Mar. 13, 2009), http://www.ncbusinesscourt.net/opinions/2009_NCBC_4.pdf; *Durham Coca-Cola*, 2003 NCBC 3.

{46} Frye argues that a final operating agreement and a management agreement are necessary and material, but were not completed or agreed to. (Defs.' Br. Supp. Mot. II 11.) Nevertheless, "reference to a more 'complete' document does not necessarily indicate that material portions of the agreement have been left open for future negotiations. It could mean only that immaterial matters, which are of no consequence, will be added to complete the agreement." *Nat'l Bank v. Wallens*, 26 N.C. App. 580, 584, 217 S.E.2d 12, 15 (1975).

{47} However, there is one sentence in the PPSA that gives the Court pause in determining that the PPSA contained all material terms. Paragraph two (2) of the "Agreement" section of the PPSA reads:

> Frye shall sell to Catawba, and Catawba shall acquire from Frye, a 50% membership interest in Tate, pursuant to the terms of agreements to be formalized hereinafter between Frye and Catawba. The material terms and conditions concerning Catawba's acquisition of the 50% membership interest in Tate and the operations of Tate *upon which the private parties have agreed as of the execution of this Agreement* are set forth in Exhibit B attached hereto.

(Compl. Exh. D) (emphasis added). This italicized language raises a question about whether the parties intended to complete further material negotiations regarding the sale of Tate to Catawba or whether they intended the PPSA to serve as the final agreement definitely obligating Frye to sell and Catawba to buy. Neither party has adequately presented evidence to persuade the Court that there is no issue of material fact as to whether the PPSA was or was not the definite and final agreement on the sale of Tate to Catawba. Therefore, the parties' intentions on the subject matter of Catawba's fourth claim for breach of contract remains a question of fact.

{48} Because the Court determines that there is a question of material fact as to whether the parties intended the PPSA to serve as a binding agreement obligating Frye to sell fifty percent (50%) of Tate to Catawba, the Court **DENIES** Motions I and II as to Catawba's fourth claim for relief.[1]

---

[1] Because there is a question of material fact related to enforceability of the PPSA, it is unnecessary for the Court to consider the parties' additional arguments at this stage of the litigation.

2.

AGENCY SETTLEMENT AGREEMENT

{49}  The Court first notes that the Agency Settlement Agreement is less detailed and is materially different from the PPSA.  The major terms of the Agreement require the parties to dismiss the Tate II contested case and release each other from all liability prompted by the Agency's review of the CON application for Tate.  (Compl. Exh. C.)  The Agency Settlement Agreement places the onus and requirement on DHHS to issue a CON for the Tate project.  (Compl. Exh. C.)  Although the Agency Settlement Agreement requires joint ownership of Tate in Frye and Catawba before the facility can be licensed and certified, the Agency Settlement Agreement does not obligate the parties to actually become joint owners of Tate. (*See* Compl. Exh. C.)

{50}  Both parties seemingly misconstrue and neglect the import of the Agency Settlement Agreement in the hopes of obtaining victory on the claims related to the PPSA.  Under the Agency Settlement Agreement, if the parties do not jointly own Tate, the facility never gets its licensure and certification, period.  Neither party obtains rights from the other's refusal to buy or sell a fifty percent (50%) interest in Tate.

{51}  There is no dispute that Frye did in fact dismiss the Tate II contested case as contemplated in the Agency Settlement Agreement and has not attempted to hold Catawba responsible for any liability that may have arisen from the Agency's review of the Tate CON application.  (Defs.' Br. Supp. Mot. II Exh. 24.)  Because Frye, and accordingly, Tate, have done all that was required of them under the Agency Settlement Agreement, there is no material fact concerning breach of the Agency Settlement Agreement.

{52}  Consequently, the Court **GRANTS** Motion II and **DENIES** Motion I and **DISMISSES** Catawba's third claim for breach of contract with prejudice.

## C.

## FIFTH CLAIM FOR FRAUD

{53} Frye also moves for summary judgment on Catawba's fraud claim. The elements of fraud are well-established: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 481, 593 S.E.2d 595, 598 (2004) (quotations and citations omitted). "Additionally, any reliance on the allegedly false representations must be reasonable." *Mancuso v. Burton Farm Dev. Co., LLC*, 748 S.E.2d 738, 749 (N.C. Ct. App. 2013).

{54} Catawba alleges that Defendants "affirmatively represented that they intended to comply with all of the terms of the Global Mediation Agreement and the Private Mediation Agreement," but had no intention to do so. (Compl. ¶ 65.) Rather, Catawba contends, Defendants used the Mediation Agreements to extract a dismissal of Viewmont II so that Viewmont could be developed to the exclusion of Tate and obtain physician ownership. (Compl. ¶¶ 65–66.)

{55} There is evidence before the Court tending to prove Frye's intent not to perform under the Tate Agreements as well as evidence to the contrary. However, even if Catawba could prove that Defendants never intended to comply with the terms of the Tate Agreements, Catawba cannot prove any injury from that fraudulent activity.

{56} Although Catawba presents an email from Frye's Vice President of Business Development, Eddie Salyards ("Salyards"), that details physician ownership of Viewmont since obtaining its CON, Salyards's email does not remotely indicate any purposeful movement of physicians to Viewmont in an effort to exclude Tate. Therefore, there is no evidence before the Court that Viewmont's physician investors would have invested in Tate had it been developed and, as such, no evidence of an injury to Catawba.

{57} Accordingly, the Court **GRANTS** Motion II and **DISMISSES** Catawba's fraud claim with prejudice.

## D.
### SIXTH CLAIM FOR UNFAIR AND DECEPTIVE TRADE PRACTICES

{58} Defendants also move for summary judgment on Catawba's UDTP claim. To prevail on a claim for UDTP, Plaintiff must show: "(1) [D]efendants committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to [P]laintiff." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 747 S.E.2d 220, 226 (2013); see also N.C.G.S. § 75-1.1 (2014).

{59} Because Catawba cannot prove injury related to Defendants' alleged fraud, it cannot survive summary judgment on its UDTP claim. Therefore, the Court **GRANTS** Motion II and **DISMISSES** Catawba's UDTP claim with prejudice.

## E.
### COUNTERCLAIM FOR BREACH OF CONTRACT

{60} Finally, Catawba moves for summary judgment on Defendants' breach of contract counterclaim. Defendants claim Catawba breached the Viewmont II/CT II Agreement by filing this lawsuit and initially seeking to rescind the Viewmont II/CT II Agreement. Specifically, Defendants contend that, by filing the lawsuit, Catawba breached the following provisions: (1) "Catawba agrees that it . . . shall not, directly or indirectly, take any action whatsoever to oppose or otherwise interfere with the issuance of [the] CON to Viewmont"; (2) "the Parties and their counsel agree to vigorously defend against any challenge to the Agreement"; and (3) "[t]his Agreement may not be amended or modified except by a writing signed by all of the Parties . . . ." (Defs.' Ans. Exh. 1 ¶¶ 3, 7, 9.) Therefore, Defendants allege, Catawba breached the Viewmont II/CT II Agreement by failing to defend it, interfering with the issuance of the CON, and seeking to amend and modify the Agreement by lawsuit.

{61} After considering the briefs in support of and in opposition to Motion I and the arguments of counsel at the hearing, the Court concludes that Catawba is not

entitled to the requested relief.  Therefore, the Court **DENIES** Motion I as to Defendants' breach of contract counterclaim.

V.

CONCLUSION

{62}   The Court **DENIES** Motion I and **GRANTS** in part and **DENIES** in part Motion II.

{63}   **WHEREFORE**, the Court hereby **DISMISSES** Catawba's first, second, and third claims for breach of contract; fifth claim for fraud; and sixth claim for UDTP.

**SO ORDERED**, this the 26th day of June, 2014.